**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>    v.<br><br>JAZIEL WYNNS,<br><br>      Defendant. | Case No. 2:20-cr-276 (BRM)<br><br>**OPINION** |

  **THIS MATTER** comes before the Court following a hearing on January 7, 2022 on restitution and forfeiture.[1] (ECF No. 104.) Plaintiff United States of America ("Government") and Defendant Jaziel Wynns ("Wynns") submitted briefing (ECF Nos. 95, 96) and supplemental briefing (ECF Nos. 105, 106). Having reviewed the parties' submissions and having held oral argument, for the reasons set forth below and for good cause having been shown, the Court **FINDS** that restitution in the amount of $28,498.99 and forfeiture in the amount of $1,000 should be paid by Wynns, pursuant to the terms of an Amended Judgment that will be entered in this case.

**I.  BACKGROUND**

  On December 19, 2017, Wynns, Olga Shevlyakova ("Shevlyakova") and Jerry Carter ("Carter") were arrested on a criminal complaint charging them with conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1349 and 2. (*See* ECF No. 1.)

---

[1] On September 22, 2021, the Court sentenced Wynns to three years' probation with special conditions along with a special assessment of $100 in connection with her guilty plea to conspiracy to commit wire fraud. (ECF Nos. 90, 92.) Judgments for restitution and forfeiture were deferred so that additional arguments could be made to the Court. (*Id.*) The Government and Wynns dispute the appropriate restitution and forfeiture amounts for which Wynns should be held responsible.

1

On March 13, 2020, Wynns was indicted on the single count, which charged that from in and around September 2015 through August 2017, in the District of New Jersey and elsewhere, Wynns knowingly and intentionally conspired and agreed with Shevlyakova and Carter to defraud payroll service companies in violation of 18 U.S.C. § 1343 (wire fraud) and § 1349 (conspiracy). (ECF No. 64.) The Indictment further charged, upon a conviction, Wynns would forfeit to the United States the property that constitutes or is derived from proceeds traceable to the commission of the conspiracy pursuant to 18 U.S.C. § 981(a)(1)(C). On or about April 21, 2021, Wynns pleaded guilty to this single count with no plea agreement from the Government. (ECF No. 80.)

On or about July 16, 2021, a final Presentence Investigation Report ("PSR") was submitted by U.S. Probation to the Court. (ECF No. 85.) The investigation revealed that from January 1, 2015 through December 18, 2017, there were at least 345 Automated Clearing House ("ACH")/direct deposit transactions totaling at least $438,932 deposited into accounts controlled by Wynns, Shevlyakova, Carter and others. (*Id.* at 7, ¶ 24.) The investigation further revealed Carter received at least $46,667 in ACH deposits, Shevlyakova received at least $335,273, Wynns received at least $28,498.99, and others received $24,396. (*Id.* at 7, ¶ 26.) The PSR states the total restitution owed to the victim payroll service companies is approximately $217,274 as follows:

| Accurate Date Payroll | $6,410.00 |
| Alpha Omega Payroll | $4,750.00 |
| Arkansas Select Tax Service | $6,732.00 |
| Ascend HR, Inc. | $3,665.00 |
| Bailey & Thompson, CPA | $6,591.00 |
| Clarance Dale Kennedy, Inc. | $5,934.00 |
| Core Placement | $4,408.00 |
| EazePay | $4,699.00 |
| EazePay/Insurance Company | $5,000.00 |
| Edna Business Solutions | $4,872.00 |
| Fronteer Payroll | $5,850.00 |
| Greenburg Accounting | $5,123.00 |

| | |
|---|---:|
| Inflection HR Payroll | $5,027.00 |
| InstaPay Payroll, Inc. | $2,815.00 |
| Midcoast Payroll | $4,734.00 |
| Olympic Payroll | $3,836.00 |
| Paycheck Connection | $12,598.00 |
| PayChex | $33,281.00 |
| Payroll Partners | $2,974.00 |
| Payroll Solutions | $5,614.00 |
| Payroll Express | $4,675.00 |
| Peggy Kusar, CPA | $6,512.00 |
| Progar Company | $6,943.00 |
| Quick Pay Payroll | $2,692.00 |
| RBSK Partners PC | $6,171.00 |
| RBSK Partners PC/Nationwide Mutual Insurance | $250.00 |
| STL Associates | $5,588.00 |
| Shore Payroll Solutions | $3,923.00 |
| TLC Payroll Solutions | $8,013.00 |
| Tri-State Employers Group (Edgewood, Kentucky) | $12,254.00 |
| Tri-State Employers Group (Springs, Kentucky) | $12,254.00 |
| TruPayroll | $4,657.00 |
| Van Cleve, Inc. | $4,369.00 |
| Wisconsin Pay Specialist | $4,060.00 |
| **Total** | **$217,274.00** |

(*Id.* at 9, ¶ 34.)

On September 22, 2021, the Court sentenced Wynns to a 3-year term of probation in connection with her conviction. (ECF No. 92.) The Court reserved on the amounts of restitution and forfeiture it would order Wynns to pay. (*Id.*)

On October 18, 2021, Wynns filed a brief on the restitution and forfeiture issues. (ECF No. 95.) On November 2, 2021, the Government filed its brief. (ECF No. 96.) The Court held oral argument on January 7, 2022, reserved decision, and ordered supplemental briefing. (ECF No.

104.) On January 31, 2022, Wynns filed a supplemental brief. (ECF No. 105.) On February 14, 2022, the Government filed a supplemental brief. (ECF No. 106.)

## II. LEGAL STANDARD

### 1. Restitution

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires district courts to order restitution in certain cases, including wire fraud. Section 3664 sets forth the procedures for ordering restitution. It requires courts to "order restitution to each victim in the full amount of each victim's losses . . . and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A). When more than one defendant has been found to have contributed to the loss of a victim, "the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

### 2. Forfeiture

The Indictment seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461. Section 981(a)(1)(C), concerning civil forfeiture, provides that "property, real or personal, is subject to forfeiture to the United States" where such property "constitutes or is derived from proceeds traceable to a violation of [certain enumerated offenses] or any offense constituting 'specified unlawful activity' (as defined in [18 U.S.C. § 1956(c)(7)]) . . . or a conspiracy to commit such offense." Section 2461, in turn, provides:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense

> giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case . . . .

Because "specified unlawful activity" is defined at 18 U.S.C. § 1956(c)(7) to include wire fraud, property that constitutes or is derived from the proceeds of wire fraud or conspiracy to commit wire fraud is therefore subject to forfeiture. *See United States v. Vampire Nation*, 451 F.3d 189, 200 (3d Cir. 2006).

Federal Rule of Criminal Procedure 32.2(b)(1)(A) provides that, "on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute." Rule 32.2(b)(1)(B) provides, "[t]he court's determination may be based on evidence already in the record, including . . . on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." The Government has the burden of proving its right to forfeiture by a preponderance of the evidence. *United States v. Voigt*, 89 F.3d 1050, 1083 (3d Cir. 1996).

### III.  DECISION

#### 1. Restitution

Wynns contends she should be ordered to pay less than the total $217,274 owed to the victims because the Court reduced her sentence after finding her less culpable than her co-conspirators. (ECF No. 95 at 7.) She states she did not become involved in the scheme until March 2016, prior to which her co-conspirators engaged in seventy-five fraudulent transactions without her involvement. (*Id.* at 5.) She asserts, following her participation in March 2016, there were no fraudulent deposits in her account until March 2017 when she next participated in the scheme. (*Id.*) She states over 131 transfers occurred during the March 2016 through March 2017 period when she was not involved. (*Id.*) She contends the full nature and scope of the scheme was not reasonably foreseeable to her. (*Id.* at 7.) Wynns argues the Court should order her to pay no more than

5

$28,498.99—the amount directly deposited into her bank accounts—as the total loss to the victims resulting from her participation in the conspiracy. (*Id.* at 8.) Wynns asks the Court to consider that she lives off social security disability benefits and after minimal monthly expenses for rent, food, transportation, and phone, she has no money left. (*Id.* at 8, 19.) In supplemental briefing following oral argument, Wynns contends the Government, by failing to provide the Court with concrete evidence she reasonably foresaw the scope of the conspiracy, failed to support, by a preponderance of the evidence, any argument she should be held responsible for the entire loss amount of $217,274. (ECF No. 105 at 1–2.)

The Government seeks an order of restitution in the total loss amount of $217,274. (ECF No. 96 at 8.) The Government cites to a March 2018 proffer with Wynns' co-conspirator, Shevlyakova, during which Shevlyakova stated that she and Wynns were friends since they were 16 years old, and she brought Wynns into the scheme because Wynns complained about financial issues to her. (*Id.* at 4.) The Government asks the Court to infer from the nature of their friendship that Wynns was aware of the lucrative nature of the scheme prior to her involvement and should have foreseen its full nature and scope. (*Id.*) In its supplemental brief, the Government asks the Court to apply common sense to find Wynns knew about the conspiracy during the periods of time when she was not involved. (ECF No. 106 at 1–2.)

Restitution under the MVRA is ordered for the purpose of "compensat[ing] the victim for its losses and, to the extent possible, to make the victim whole." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001). As this is a case with multiple defendants, the Court may, in its discretion, apportion liability among Wynns and her co-conspirators "to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h); *United*

*States v. Kolodesh*, 787 F.3d 224, 243 & n.24 (3d Cir. 2015); *United States v. Breisacher*, No. 11-338, 2012 U.S. Dist. LEXIS 94430, at *10 (D.N.J. July 6, 2012).

  Of the $217,274 in losses sustained by the victims, the majority occurred as a result of conduct not attributable to Wynns. The parties agree the sum of $28,498.99—approximately 13% of the total loss amount—represents payments made directly to Wynns' bank accounts. While the Government is correct the Court has the discretion to order Wynns to pay restitution for the full $217,274 jointly and severally with her co-conspirators, the Court finds this is an appropriate case to apportion Wynns' restitution obligation. *See Diaz*, 245 F.3d at 312 (affirming apportioned restitution orders); *see also United States v. Salas-Fernandez*, 620 F.3d 45, 49 (1st Cir. 2010); *United States v. Hunt*, 521 F.3d 636, 640, 649 (6th Cir. 2008); *United States v. Scott*, 270 F.3d 30, 53 (1st Cir. 2001); *United States v. Trigg*, 119 F.3d 493, 497 (7th Cir. 1997). The Government provided no proofs Wynns contributed in any way to the balance of the losses not directly deposited into her accounts, nor does the Government submit any proofs establishing the entire loss amount was reasonably foreseeable to Wynns beyond pointing to her longstanding friendship with a co-conspirator. Considering "the level of [Wynns'] contribution to the victim's loss" here leads the Court to conclude Wynns' played a relatively minor role in causing the losses. The Court also considers Wynns' financial resources, which Wynn has represented, and the Government does not dispute, are limited. Therefore, the Court finds Wynns is liable for restitution to the victim payroll service companies in the following amounts, calculated in proportion to the victims' total losses as identified in the PSR:

| Accurate Date Payroll | $ | 840.78 |
|---|---|---|
| Alpha Omega Payroll | $ | 623.04 |
| Arkansas Select Tax Service | $ | 883.01 |
| Ascend HR, Inc. | $ | 480.72 |
| Bailey & Thompson, CPA | $ | 864.52 |

| | |
|---|---|
| Clarance Dale Kennedy, Inc. | $ 778.34 |
| Core Placement | $ 578.18 |
| EazePay | $ 616.35 |
| EazePay/Insurance Company | $ 655.83 |
| Edna Business Solutions | $ 639.04 |
| Fronteer Payroll | $ 767.32 |
| Greenburg Accounting | $ 671.96 |
| Inflection HR Payroll | $ 659.37 |
| InstaPay Payroll, Inc. | $ 369.23 |
| Midcoast Payroll | $ 620.94 |
| Olympic Payroll | $ 503.15 |
| Paycheck Connection | $ 1,652.43 |
| PayChex | $ 4,365.34 |
| Payroll Partners | $ 390.09 |
| Payroll Solutions | $ 736.37 |
| Payroll Express | $ 613.20 |
| Peggy Kusar, CPA | $ 854.15 |
| Progar Company | $ 910.69 |
| Quick Pay Payroll | $ 353.10 |
| RBSK Partners PC | $ 809.43 |
| RBSK Partners PC/Nationwide Mutual Insurance | $ 32.79 |
| STL Associates | $ 732.96 |
| Shore Payroll Solutions | $ 514.57 |
| TLC Payroll Solutions | $ 1,051.03 |
| Tri-State Employers Group (Edgewood, Kentucky) | $ 1,607.31 |
| Tri-State Employers Group (Springs, Kentucky) | $ 1,607.31 |
| TruPayroll | $ 610.84 |
| Van Cleve, Inc. | $ 573.07 |
| Wisconsin Pay Specialist | $ 532.53 |
| **Total** | **$ 28,498.99** |

Restitution is to be paid jointly and severally with Wynns' co-defendants Carter and Shevlyakova.

2. **Forfeiture**

The parties disagree on the amount Wynns "obtained" from the scheme. Wynns argues she "obtained" only approximately $1,000 of the total $28,498.99 deposited into her accounts because

8

she gave the balance to her co-conspirators pursuant to their agreement. (ECF No. 95 at 13–14.) She claims the co-conspirators controlled the bank accounts, advised her when the deposits hit, and advised her when to withdraw the money and how much to withdraw. (*Id.* at 14.) She notes she does not have an accounting of exactly how much she kept, but her estimate is $1,000. (*Id.* at 4, n.4.) In support of her argument, Wynns relies on *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). (*Id.* at 15.) In her supplemental brief, Wynns contends the record of bank charges demonstrate she received only approximately $700, which is "well within the amount of money [she] recalls receiving as a result of her involvement in the fraud." (ECF No. 105 at 2–3.)

The Government argues Wynns "obtained" the total amount deposited into her bank accounts, regardless of whether Wynns gave some of it to her co-conspirators. (ECF No. 96 at 9.) The Government contends *Honeycutt* is inapplicable because the accounts were in Wynns' sole name and therefore in her exclusive control. (*Id.* at 10.) In its supplemental brief, the Government argues there are no text messages, emails, phone logs or other evidence to support Wynns' claim she provided Shevlyakova with some portion of the money deposited into Wynns' bank accounts. (ECF No. 106 at 2–3.)

In *Honeycutt*, the Supreme Court resolved whether co-conspirators could be jointly and severally liable in forfeiture for proceeds from a conspiracy pursuant to 21 U.S.C. § 853, which applies to persons convicted of certain drug crimes. 137 S. Ct. at 1629. The case involved two brothers: the owner of a hardware store and his store's sales and inventory manager. *Id.* at 1630. Both were indicted for various federal crimes relating to their sale of iodine used to manufacture methamphetamine. *Id.* The Supreme Court held the brothers could not be held jointly and severally liable as such would be inconsistent with the text and structure of the statute. *Id.* at 1626.

The Court provided an "instructive" example:

9

> Suppose a farmer masterminds a scheme to grow, harvest, and distribute marijuana on local college campuses. The mastermind recruits a college student to deliver packages and pays the student $300 each month from the distribution proceeds for his services. In one year, the mastermind earns $3 million. The student, meanwhile, earns $3,600.

*Id.* at 1631. If joint and several liability applied, the Court observed, the student would face a forfeiture judgment of proceeds for the entire $3 million conspiracy "even though he never personally acquired any proceeds beyond the $3,600." *Id.* at 1632. The Court noted that Sections 853(a)(1), (2), and (3) "by their terms, limit forfeiture under § 853 to tainted property." *Id.* at 1631–32. The Court observed that holding the college student jointly and severally liable for the proceeds of the entire conspiracy would obligate him to pay the Government $3 million. *Id.* at 1632. "Of the $3 million, $2,996,400 would have no connection whatsoever to the student's participation in the crime and would have to be paid from the student's *untainted* assets. Joint and several liability would thus represent a departure from §853(a)'s restriction of forfeiture to *tainted* property." *Id.* (emphasis added).

The Court next noted, "[i]n addition to limiting forfeiture to tainted property, §853(a) defines forfeitable property solely in terms of personal possession or use" because the meaning of "obtain" is "to come into possession of" or to "get or acquire." *Id.* The Court concluded that "[f]orfeiture pursuant to §853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635. Accordingly, only "actually acquired," "tainted" property is subject to forfeiture. *Id.* at 1632, 1635.

The Third Circuit in *United States v. Gjeli*, held that *Honeycutt* applies to 18 U.S.C. § 981(a)(1)(C), the forfeiture statute at issue here, because of its similarity to the language of Section 853. 867 F.3d 418, 426–28 (3d Cir. 2017). The district court had entered preliminary orders of forfeiture making both defendants jointly and severally liable for more than $5 million of the

10

proceeds from racketeering operations. *Id.* at 420. In remanding the case, the Third Circuit instructed the district court to reconsider the forfeiture orders in accordance with *Honeycutt*'s mandate that forfeiture be limited to property that is "actually acquired." *Id.* at 427–28. The Ninth Circuit in *United States v. Thompson*, adopting the Third Circuit's reasoning in *Gjeli*, explains the history of forfeiture, its application to 18 U.S.C. § 981(a)(1)(C), and the requirement that the property ordered to be forfeited carry the requisite "taint":

> [F]orfeiture traces from the English common law concept of deodand (having been given to God). The deodand concept, in turn, traces in part from the biblical injunction that an ox that fatally gored a human was to be stoned to death. At common law, an object that caused a person's death became a deodand and was forfeited to the king in the expectation that the king would provide the money for Masses to be said for the good of the victim's soul or use the money for charity (thereby purifying the property that had been tainted by the wrongdoing). This common law origin and development explains why forfeiture is closely tied to the property involved in the criminal conduct, as opposed to a criminal fine or restitution, which depends on guilt but not on any taint on the criminal's property. Both the possibility that the value of the forfeited property may be greater than the maximum fine that could be levied, and the limitation of forfeiture to tainted property, distinguish this mechanism from other sorts of criminal penalties. Though forfeiture performs many of the same social functions as fines and restitution orders, its mechanics are different because of its unique conceptual basis.
>
> . . .
>
> *Honeycutt* treats forfeiture, in accord with its development at common law over many centuries, as applicable only to "tainted" property. . . . The forfeited "property," under Section 981(a)(1)(C), has to be "traceable" to the proceeds "derived" from the wire fraud. . . . The text of this statute and its roots in common law forfeiture, like the statute in *Honeycutt*, necessitate a connection to tainted property.

990 F.3d 680, 687–89 (9th Cir. 2021) (citing *Calero v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–81 (1974); *Honeycutt*, 137 S. Ct. at 1630–35; *Gjeli*, 867 F.3d at 427–28, 427 n.16).

Here, there is no dispute Wynns received $28,498.99 into her bank accounts. However, pursuant to *Honeycutt*, what happened to the money after Wynns received it is highly relevant,

11

given that the Government must prove by a preponderance of the evidence that Wynns "actually acquired" the full amount of $28,498.99, *i.e.*, the total amount of tainted assets, as Section 981(a)(1)(C) does not allow forfeiture of untainted assets.

The Government has not met this burden. In its submission, the Government states "[s]ometimes the Defendant would give money to Shevlyakova from these accounts but Shevlyakova could not estimate how much the Defendant might have given her and Carter." (ECF No. 96 at 4.) In other words, the Government cannot dispute Wynns did not "actually acquire" *all* of the tainted proceeds, as some – albeit an undefined amount – were given to Shevlyakova. The essential point of the hypothetical college student in *Honeycutt* is that making the student liable for the entire $3 million would require the student to pay more than what he was permitted by the mastermind to keep. *See Thompson*, 990 F.3d at 688 ("[E]ven if the farmer had customers pay the student, who then turned the money over to the farmer, the farmer ultimately 'obtains' the property—whether 'directly or indirectly.'") (citing *Honeycutt*, 137 S. Ct. at 1632–33.) But only untainted funds could be used to satisfy such an obligation. *Honeycutt*, 137 S. Ct. at 1632–33. Therefore, making Wynns liable for the full amount of $28,498.99, when the Government has represented to the Court some of those tainted assets landed in Shevlyakova's hands, would require Wynns to pay some portion from her own untainted assets, which is prohibited by the statute. *See id.* at 1632.

Therefore, the Government has not met its burden of proving by a preponderance of the evidence that the amount subject to forfeiture, $28,498.99, would be paid from only tainted funds. Despite conceding some portion of the $28,498.99 went to Shevlyakova, the Government did not submit proofs as to how much of the balance actually remained with Wynns. The Government and Wynns agree that the bank charges demonstrate Wynns actually acquired at least $700, and Wynns

concedes she received additional money, for a total of $1,000. Accordingly, Wynns shall forfeit $1,000.

### IV. CONCLUSION

For the reasons set forth above, the Court **FINDS** that restitution in the amount of $28,498.99 and forfeiture in the amount of $1,000 shall be paid by Wynns, pursuant to the terms of an Amended Judgment that will be entered in this case.

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
UNITED STATES DISTRICT JUDGE

Dated: March 8, 2022